# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00583-CV

**Pifi Constancio, Individually and on behalf of The Estate of
Ruben Constancio, Deceased, Appellant**

**v.**

**James Bray, M.D., Appellee**

## FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 119TH JUDICIAL DISTRICT
## NO. B-06-0157-C-1, HONORABLE THOMAS J. GOSSETT, JUDGE PRESIDING

## O P I N I O N

Pifi Constancio, individually and on behalf of the estate of Ruben Constancio, deceased, appeals the district court's dismissal of her medical malpractice claims against Dr. James Bray for failure to serve an expert report as required by chapter 74 of the civil practice and remedies code. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351 (West Supp. 2008). Constancio raises two issues on appeal: (1) the district court abused its discretion in dismissing her claims because the expert report she served was adequate under chapter 74, and (2) although the district court granted her an extension to amend the expert report to cure deficiencies, the court abused its discretion by only granting her a 7-day extension of the 120-day deadline for serving an expert report rather than the statutorily required 30-day extension period.

We conclude that the expert report in question is deficient and affirm the district court's finding on that issue. However, we also conclude that the district court erred in granting

Constancio an extension to cure the deficiencies in her expert report that did not conform with the requirements of section 74.351. Although we affirm the district court's finding that Constancio's expert report at issue at the time of the hearing on the motion to dismiss does not satisfy the requirements of section 74.351, the defect is such that it may be curable.[1] It appears from the record that the district court may have intended to exercise its discretion to grant Constancio the full relief available under the statute with respect to an extension to cure pursuant to section 74.351(c). In light of our opinion that the manner in which the district court granted the extension in this cause did not conform to the statute, we reverse the order of dismissal and remand this cause for the district court to consider—in its discretion—whether to grant Constancio an extension that complies with section 74.351(c) for the purpose of curing the deficiency in her expert report.

***Factual and Procedural Background***

In December 2003, Constancio's husband, Ruben, died of cardiorespiratory arrest at Shannon West Texas Memorial Hospital. He had been under the care of Dr. James Bray. On February 3, 2006, Constancio sued Dr. Bray for alleged medical negligence in his care and treatment of Ruben.[2] Her original petition alleged that Dr. Bray was negligent in the following respects:

---

[1] We agree with the district court that Constancio's expert report constitutes "some report" although it is defective. The defects are not such that it is subject to being categorized as "no report." It is, therefore, within the category of reports that are potentially subject to the provisions of section 74.351(c). *See Austin Heart P.A. v. Webb*, 228 S.W.3d 276, 284-85 (Tex. App.—Austin 2007, no pet.).

[2] Shannon West Texas Memorial Hospital was originally a named defendant in this lawsuit. However, on August 10, 2006, the district court severed Constancio's claims against Shannon West Texas Memorial Hospital from her claims against Dr. Bray. Thus, the only claims in this appeal are Constancio's claims against Dr. Bray.

"(a) ordering Ativan, morphine and Phenergan to be administered to Ruben Constancio, . . . in [the] face of respiratory distress; (b) not coming in to evaluate the patient in [the] face of respiratory distress and deterioration; (c) decreasing the frequency of nursing assessments and vital sign checks in the face of patient's deterioration and respiratory distress."

On the same day she filed her original petition—February 3, 2006—Constancio filed and served the expert report and curriculum vitae of Dr. Steven Hata pursuant to section 74.351 of the civil practice and remedies code setting forth Dr. Hata's opinions regarding Ruben's treatment. Dr. Bray filed a motion objecting to the adequacy of this expert report on February 22, 2006, claiming that "Dr. Hata's report fails to set forth Mr. Constancio's symptoms and conditions, what the standard of care called for Dr. Bray to do in treating those specific symptoms and conditions, that the applicable standard of care was breached by Dr. Bray in his treatment of Mr. Constancio and that same caused Mr. Constancio's death." In response, Constancio claimed that the report was sufficient as written and, in the alternative, requested that the district court grant her "a thirty (30) day extension of the 120-day deadline" in the event the court found the expert report deficient.

On May 10, 2006, 96 days after the original petition was filed, the district court held a hearing on the adequacy of the expert report and found that it was deficient as to causation and the standard of care. At the end of the hearing, the district court announced that it would grant an extension under section 74.351(c) and Constancio would have 30 days from the date of the hearing, or until June 10, 2006, to cure the deficiencies in the expert report. The district court entered an order reflecting this ruling on May 15, 2006.

On May 26, 2006, 112 days after the filing of the original petition, Constancio filed and served an amended expert report and curriculum vitae of Dr. Steven Hata setting forth Dr. Hata's opinions regarding Ruben's treatment. Dr. Bray filed a motion to dismiss Constancio's claims on June 8, 2006, arguing that "the report still fails to identify the standard of care applicable to James Bray, M.D. in treating the decedent, Ruben Constancio and how any breach of the standard of care by James Bray, M.D in treating the decedent, . . . proximately caused the death of Ruben Constancio." Constancio responded that the report was sufficient as written and, in the alternative, requested that the court give her an "extension until thirty days from June 2, 2006, as provided by 74.351(c)."[3] After conducting a hearing on the motion to dismiss on June 14, 2006—131 days from the filing of the original petition—the district court sent a letter to the parties announcing that he intended to grant Dr. Bray's motion to dismiss because the amended expert report "fails to provide an adequate causational connection between the alleged standard of care, the alleged breach thereof, and the death of Mr. Constancio."

On August 10, 2006, Constancio requested an "additional twenty-three days, or until August 19, 2006, to file an expert report" on the basis that the original extension granted by the district court did not conform to statutory requirement of allowing a full 30 days of extension. This request for additional time was denied by the district court on August 10, 2006. Nevertheless, on

---

[3] After Constancio filed her original petition in this cause on February 3, 2006, she had 120 days, or until June 3, 2006, to file and serve on each party or the party's attorney one or more expert reports. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a) (West Supp. 2008). June 3, 2006, fell on a Saturday. Thus, the request for an extension "until thirty days from June 2, 2006," in Constancio's response to Dr. Bray's motion to dismiss, was a reference to the last business day of the 120-day period for serving expert reports.

4

August 17, 2006, Constancio filed and served a second amended report and curriculum vitae of Dr. Steven Hata setting forth his opinions regarding Ruben's treatment. On August 18, 2006, the district court entered an order dismissing Constancio's claims against Dr. Bray with prejudice and once again denied Constancio's request for the previous extension to be expanded to a full 30 days. The district court's order of dismissal stated that the first amended report "fails to set forth that any failure to meet the standard of care by Dr. James Bray in his treatment of the decedent, Ruben Constancio, caused Ruben Constancio's death." The court also awarded $5,000 in attorneys' fees to Dr. Bray. The district court did not consider or rule on the question of whether the second amended report served on August 17, 2006, was deficient.

### Adequacy of the First Amended Expert Report

Section 74.351 of the civil practice and remedies code requires a claimant pursuing a health care liability claim to serve one or more expert reports on each party no later than the 120th day after the filing of the original petition. *Id.* § 74.351(a). The expert report must provide "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6). A court shall grant a motion challenging the adequacy of a report only if the report "does not represent an objective good faith effort to comply" with the definition of "expert report" in the statute. *Id.* § 74.351(*l*). To constitute a good faith effort, the report must provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question, and (2) it must provide a basis for the district court to

conclude that the claims have merit. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (citing *American Transitional Care Ctrs., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001)).

The Texas Supreme Court has also stated that a report need not marshal all of the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in section 74.351. *Palacios*, 46 S.W.3d at 878. A report cannot merely state the expert's conclusions about the statutory elements. *Id.* at 879. "Rather, the expert must explain the basis of his statements to link his conclusions to the facts." *Bowie Mem'l*, 79 S.W.3d at 52 (quoting *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999)). In addition, since the statute focuses on what is required in the report, the only information relevant to determining whether a report complies with the statute is "within the four corners of the document." *Palacios*, 46 S.W.3d at 878. This requirement precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended. *Austin Heart P.A. v. Webb*, 238 S.W.3d 276, 279 (Tex. App.—Austin 2007, no pet.); *see also Bowie Mem'l*, 79 S.W.3d at 53 ("The report must include the required information within its four corners."); *Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855, 859 (Tex. App.—Houston [1st Dist.] 2006, no pet.). There are no "magical words" that an expert must use, such as describing causation in terms of "reasonable medical probability," that determine the adequacy of the report. *See Bowie Mem'l*, 79 S.W.3d at 53.

We review a trial court's ruling on a motion to dismiss under section 74.351 for an abuse of discretion. *Palacios*, 46 S.W.3d at 877-78. A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). A trial court does not

6

abuse its discretion simply because it may decide a matter within its discretion differently than an appellate court. *Id.* at 42. However, a trial court has no discretion in determining what the law is or applying the law to the facts. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992). A clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion. *Id.*

The district court dismissed Constancio's suit after finding the first amended expert report deficient. The parties do not dispute that the first amended report fairly summarizes the alleged standard of care and how Dr. Bray allegedly breached the standard of care. The parties only contest whether the first amended report constitutes a good faith effort to fairly summarize the causal relationship between Dr. Bray's alleged breach and Ruben's death. Constancio argues that the district court abused its discretion in finding that the first amended report was deficient under section 74.351 because it states Dr. Hata's conclusions regarding causation and links them to specific facts. Dr. Bray responds that the district court did not err in finding the first amended report deficient because it is "conclusory and speculative" on the issue of causation, failing to provide information linking Dr. Bray's alleged breach of the standard of care to Ruben's death.

The four-page first amended report provides Dr. Hata's qualifications, the materials that he reviewed, background facts regarding Ruben's treatment, and sections on the standard of care, Dr. Bray's alleged deviations from the standard of care, and causation. Dr. Hata notes that he reviewed Ruben's medical records and summarizes portions of these records detailing the relevant aspects of Ruben's treatment:

> On 12/1/03 at 0040 Mr. Constancio showed tachypnea with a respiratory rate of 32 with bilateral wheezes with a heart rate of 102. No pulse oximetry was reported. His nurse reports that he was agitated at 0145 hours. There was no

report of pain, nausea, or anxiety. The nurse [name illegible] injected lorazepam 0.5 mg IV, morphine 2.0 mg IV, and Phenergan 25 mg IV, all at 0145 hours into Mr. Constancio. There are no vital signs written at this time or pulse oximetry. At 0230 hours, Mr. Constancio was reportedly asleep. Mr. Constancio coded at 0340 hours. He required intubation and medical ventilation. He was then admitted to the ICU and treated with broad-spectrum antibiotics. Blood cultures were positive for methicillin resistant Staphylococcus aureus. Chest x-ray showed chest inflitrates suggestive of pulmonary edema.

The patient showed no responsiveness after the event. Dr. Chang stated that the findings were consistent anoxic encephalopathy. The patient died on 12/13/03.

Dr. Hata then states that the standard of care for Ruben would have required:

(1) Re-evaluation of the increasingly disoriented patient on 11/30/03 and 12/1/03 by going to the patient's bedside, listen to the lungs with a stethoscope and performing a neurologic examination;

(2) obtain current blood studies of his glucose level to monitor for diabetic ketoacidosis with blood tests;

(3) monitor continuous oxygen saturation levels with the use of pulse oximetry recorded at least every 15 minutes;

(4) increase, rather than decrease, the frequency of monitoring vital signs (blood pressure; pulse; respirations; and blood oxygen saturation);

(5) admit Mr. Constancio to ICU for intensive monitoring;

(6) place Mr. Constancio on supplemental oxygen.

Dr. Hata states that Dr. Bray deviated from the standard of care by failing to:

(1) Re-evaluate Mr. Constancio on 11/30/03 and 12/1/03;

8

(2) obtain current blood studies of Mr. Constancio's glucose level to monitor for diabetic ketoacidosis;

(3) order continuous oxygen saturation levels with the use of pule oximetry;

(4) order an increase in the frequency of monitoring vital signs (blood pressure; pulse; respirations; and blood oxygen saturation);

(5) admit Mr. Constancio to ICU for intensive monitoring;

(6) place him on supplemental oxygen.

The first amended report concludes with a section entitled "Causation," in which Dr. Hata states, "[h]ad Dr. Bray complied with the standard of care, within reasonable medical probability, Mr. Constancio would not have died when he did." Dr. Hata explains that had Dr. Bray admitted Ruben to the ICU, he would have received constant monitoring and hypoxemia would have "in reasonable medical probability" been recognized by the nurses, who would have alerted Dr. Bray. Dr. Hata opines that if Dr. Bray had then complied with the standard of care and ordered supplemental oxygen or a ventilator, treated the diabetic ketoacidosis by lowering Ruben's blood glucose, and recognized and reversed the combination effects of the medications given, Ruben "would not have died during that hospitalization, and would have, in reasonable medical probability, recovered and been discharged."

After reviewing the first amended report, we conclude that the district court did not abuse its discretion in determining that it does not adequately present a summary of the expert's opinion of the causal relationship between Dr. Bray's alleged failure to meet the applicable standards of care and Ruben's death. The problem with the first amended report is that it fails to show, within

9

its four corners, how increased monitoring and the detection of hypoxemia would have prevented Ruben's death.

As an initial matter, the first amended report fails to adequately explain how Dr. Bray's alleged failure to monitor Ruben's oxygenation status through the use of continuous pulse oximetry led to his death. The first amended report states that "[c]loser evaluation . . . would have led Dr. Bray to recognize that Mr. Constancio's agitation was not a response to pain, but a symptom of hypoxemia. . . . Pulse oximetry at this level in this patient is significantly abnormal and indicates hypoxemia." The report goes on to explain that had Ruben been admitted to the ICU and received constant monitoring, his hypoxic condition would have, in reasonable medical probability, been recognized by the nursing staff and Dr. Bray would have been notified. The report goes on to state that the standard of care would have then required Dr. Bray to put Ruben on supplemental oxygen or a ventilator, treat his diabetic ketoacidosis, and recognize and reverse the combination effects of the medications given. The problem is that there is nothing in the first amended report that explains how any of these steps would have prevented the life-threatening condition that caused Ruben's death.

The first amended report's most significant flaw is that it fails to indicate the condition of which Ruben ultimately died. The first amended report explains that after Ruben "coded" on 12/1/03, "Dr. Chang stated that the findings were consistent with anoxic encephalopathy. The patient died on 12/13/03." However, the report does not explain the cause of the anoxic encephalopathy, nor how, or if, anoxic encephalopathy leads to death. Constancio's argument requires us to assume that Dr. Hata's inclusion of Dr. Chang's diagnosis of anoxic encephalopathy

10

indicates not only that he has adopted Dr. Chang's statement that Ruben had anoxic encephalopathy, but also that he believes that Ruben's untreated hypoxia caused the anoxic encephalopathy and that the anoxic encephalopathy caused Ruben's death. This argument requires us to go outside of the four corners of the amended report and make assumptions to surmise how Ruben died. Without knowing with any certainty what Ruben ultimately died of, we have no indication of the relationship between Dr. Bray's alleged conduct and Ruben's death.

Constancio argues that several cases from other courts of appeals stand for the proposition that a conclusion based on deviation from the standard of care is sufficient to meet the causation requirement of section 74.351. However, these cases are distinguishable from Constancio's case because the report in each expressly identifies the cause of death or specific injury caused by deviation from the standard of care. For example, the report in *Bustillos v. Rowley* addresses causation by "indicating that if Ms. Arriola had been properly monitored, emergency department personnel could have detected and treated the worsening symptoms of Ms. Arriola's *pulmonary edema, the life-threatening condition* which was aggravated by the preventable conditions of cardio-vascular collapse and cardiac arrest and *cause of her death*." 225 S.W.3d 122, 131 (Tex. App.—El Paso 2005, pet. denied) (emphasis added). This report adequately links the expert's conclusions to the facts on the issue of causation because it links the breach of the standard of care to pulmonary edema and cardiac arrhythmia, the expressly identified cause of death. *See id.* at 130-31.

Similarly, in *Gallardo v. Ugarte*, a survival and wrongful death action, the report identifies the specific injury and cause of death. *See* 145 S.W.3d 272, 280 (Tex. App.—El Paso 2004, pet. denied). The portion of the *Gallardo* report on which Constancio relies discusses

11

decubitus ulcers, which were not the cause of death, but an injury for which the plaintiff sought pain and suffering damages in the survival action. *See id.* at 278 n.4, 279-80. The *Gallardo* report provides ample statements on the cause of this injury. *See id.* at 279-80. The *Gallardo* report goes on to address causation with regard to the decedent's congestive heart failure, which is identified as the cause of death. *See id.* at 280.

Finally, Constancio relies on an unpublished memorandum opinion from the Corpus Christi Court of Appeals to argue that a "failure to treat" allegation with an expert opinion that timely treatment would have prevented injury is adequate. *See* Tex. R. App. P. 47.1 (regarding citation to unpublished opinions). However, the report at issue in that case satisfies the causation requirement because it ties the statements regarding the failure to monitor and treat to a specific injury. *See Salinas v. Gomez*, No. 13-05-529-CV, 2006 Tex. App. LEXIS 2386, at *8 (Tex. App.—Corpus Christi Mar. 30, 2006, no pet.) (mem. op.). The report in *Salinas* explains:

> This failure to monitor and timely refer allowed this patient's head to continue to grow abnormally. The increase in head circumference was a direct result of increased intracranial pressure caused by progressive hydrocephalus. The untreated increased intracranial pressure directly caused brain cell injury and death which proximately caused Isaiah Gomez's permanent disability.

*Id.* This passage ties the opinion as to the breach of the standard of care—the failure to monitor and treat—to a specific injury, brain cell injury and death, that would not have occurred but for the alleged breach of the standard of care.

These cases differ from Constancio's case in the crucial respect that the reports each identify a cause of death or specific injury that would have been prevented had the physician

12

complied with the standard of care. Although Constancio's amended report explains that had Dr. Bray followed the standard of care by continuously monitoring Ruben, his hypoxic condition would have been recognized and Ruben would have been treated with a ventilator or supplemental oxygen, it does not indicate how, or if, hypoxemia ultimately caused Ruben's death. Therefore, Dr. Hata's report does not satisfy the requirement that the alleged breach of the standard of care caused the harm alleged—i.e. an opinion that if Ruben's hypoxemia had been treated, whatever condition that caused his death would have been prevented and Ruben would not have died. Consequently, we hold that the district court did not abuse its discretion in concluding that the report was deficient.

### *Extension of the 120-day Period for Serving an Expert Report*

In her second issue, Constancio argues that the district court did not properly apply the cure provisions of section 74.351(c) when granting an extension to cure the deficiencies in her original expert report, resulting in only a 7-day extension of the 120-day deadline for serving expert reports. The record shows that Constancio filed her original petition on February 3, 2006. Pursuant to section 74.351(a), she had 120 days, or until June 3, 2006, to serve one or more expert reports on the parties. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). On May 10, 2006, the district court held a hearing on Dr. Bray's objections to the adequacy of Constancio's original report, which was served on the same day she filed her original petition. At that hearing, the district court found the report deficient and granted Constancio an extension to cure the deficiencies under section 74.351(c). However, the parties disputed the proper application of the statutory cure period provisions:

13

| | |
|---|---|
| [Counsel for Bray]: | I assume it's the Court's ruling that [Constancio] would have thirty days under the new law in which to cure– |
| The Court: | I apologize. I did forget that. Under 95(i) you didn't, but you still have time to cure that, as I understand it. |
| [Counsel for Constancio]: | Is it thirty days from the end of 120, Your Honor? |
| The Court: | Now that, I cannot tell you. |
| [Counsel for Bray]: | From the date the Plaintiff first received notice of the Court ruling, so our position would be it would be thirty days from today, Your Honor. |
| . . . . | |
| The Court: | Okay. So you [Constancio] are granted one thirty day extension from today's date, okay? That will be the order of the Court. |

Under the court's ruling, Constancio had 30 days from the date of the hearing, or until June 10, 2006, to cure the deficiencies in her report. The district court's due date had the effect of extending the original 120-day report deadline by only 7 days—June 3 to June 10. The question presented is whether the cure and extension provisions of section 74.351(c) may be applied in this manner or whether the statute requires the district court—when granting an extension—to extend the 120-day report deadline, at a minimum, by 30 days to 150 days from the filing of the original petition.[4]

Our resolution of this issue turns on the specific language of the relevant portions of section 74.351 setting out the procedures for serving expert reports in heath care liability cases.

---

[4] We note that this would be a minimum extension. The statute plainly provides that when notice of the court's order granting an extension is received by a plaintiff outside of the 120-day period for serving reports, the 30 days runs from the date the plaintiff receives notice of the court's order granting the extension.

14

When, as here, the language of the statute is unambiguous, we adopt the interpretation supported by the plain language. *State ex rel. State Dep't of Highways & Pub. Transp. v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002). We will not give an undefined statutory term a meaning that is out of harmony or inconsistent with other provisions in the statute. *McIntyre v. Ramirez*, 109 S.W.3d 741, 745 (Tex. 2003).

A claimant pursuing a health care liability claim "shall, not later than the 120th day after the date the original petition was filed, serve on each party or the party's attorney one or more expert reports." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). The court may grant a one-time extension to cure deficiencies of an expert report as follows:

> If an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the court may grant one 30-day extension to the claimant in order to cure the deficiency. If the claimant does not receive notice of the court's ruling granting the extension until after the 120-day deadline has passed, then the 30-day extension shall run from the date the plaintiff first received the notice.

*Id.* § 74.351(c). Thus, under the plain language of the statute, an extension of time to cure deficiencies of a report is only available when a report has been served within the 120-day deadline and elements of the report have been found deficient by the district court. The court's finding that the report is deficient, in the terminology of the statute, means that a complying or satisfactory expert report has not yet "been served" within the 120-day deadline. *See Lewis v. Funderburk*, 253 S.W.3d 204, 207-08 (Tex. 2008).

15

The statute does not indicate in any fashion that the serving of a report that is found to be deficient has the effect of ending the running of the 120-day period in which in the plaintiff may attempt to serve a complying report. To the contrary, if a report is served, objected to, and found deficient by the district court before the 120-day deadline has passed, the claimant has the remainder of the 120 days in which he may decide to cure the deficiencies of the report, serve an entirely new report, or do nothing before the defendant physician or health care provider may then file a motion to dismiss the claim. *See id.* § 74.351(a)-(b). Nowhere does the statute state that the 120-day deadline will be cut short by the claimant filing a deficient report or by filing no report at all. Consequently, there is never a need, nor is there any statutory authority for, a trial court to grant an extension that is designed to run within the 120-day statutory period. It follows that the extension referenced in subsection (c) must be an extension of the 120-day period that the statute already allows plaintiffs to put together their expert reports. This means that when a trial court grants a section 74.351(c) extension, it is extending the 120-day deadline to 150 days from the date of the filing of the original petition. It is not simply a new deadline for the plaintiff to serve an amended or revised report that is 30 days from the date the trial court finds a report deficient. A plaintiff has, by statute, 120 days from the filing of the petition in which to get a complying report served even if the plaintiff has already served one or more non-complying reports. The entire purpose of section 74.351(c) is to extend the 120-day period if the trial court believes, in its discretion, such an extension is warranted. Such an extension is a one-time event, and its length is prescribed at 30 days, making the extended period 150 days from the date of the petition or 30 days from the date

16

the claimant receives notice of the order granting the extension, if received outside the 120-day period. *Id.* § 74.351(c).

If an expert report is served early in the statutory period and objections are filed and heard right away, a revised complying report could well be served within the 120-day statutory period without any need for an extension. However, the statutory scheme plainly contemplates the possibility that a plaintiff, thinking he has served a complying report within the deadline, may not find out that the trial court views the situation differently until near the end of the 120-day period, or after it has run. In such a situation, the legislature has given trial courts the authority to extend the 120-day period for 30 days to give a plaintiff an opportunity to amend or revise a deficient, but potentially curable, report. In that case, the statute can have the effect of extending the period beyond 150 days if the plaintiff does not receive notice of the court's grant of the extension within the 120-day period. This procedure has the effect of giving plaintiffs the full benefit of the 120-day statutory period for serving a report while also preventing them from being blind-sided by an unexpected ruling from the court or objections to the report that are not required to be filed until the end of the 120-day period or after the period has run. Interpreting the extension contemplated by section 74.351(c) in any other manner would effectively read it out of the statute as well as create an incentive for plaintiffs not to serve their expert reports as early as possible for fear of losing their time cushion for working on their reports that the 120-day period was intended to provide.

Dr. Bray argues that the 30-day extension begins to run from the date the claimant receives notice of the district court's ruling granting the extension, regardless of whether the 120-day filing deadline has passed as of that date. We disagree. The statute requires the 30-day extension

17

of the deadline to run from the date the claimant receives notice of the district court's ruling granting the extension *only* if the 120-day deadline has passed. *See id.* This is entirely sensible to account for the possibility that a trial court may not conduct a hearing on the adequacy of an expert report until after the 120-day period has run. A 30-day extension of the 120-day period upon a ruling 60 days after the 120-day deadline has run would not be of much use to a plaintiff unless the extension ran from the date of the notice of the extension—hence, the need for the statutory exception. An exception is not needed when a claimant receives notice of the district court's ruling that the report is deficient well before the 120-day deadline has passed because the plaintiff has time to react within the deadline of the statute. Consequently, the statute does not require the 30 days to begin running on the date the extension is granted if it is granted before the 120-day period ends. If granted before the 120-day period ends, as previously discussed, the 30-day extension extends the 120-day period to 150 days.

In this case, the district court expressed its intention to grant Constancio an extension under section 74.351(c). However, by only granting Constancio a 30-day extension from the date of the hearing, which was some 23 days before the end of the period for serving a complying report, the district court did not actually grant Constancio a 30-day extension of the 120-day period as required by section 74.351(c). The practical effect of the district court's order was to extend the 120-day filing period by only 7 days. According to the terms of subsection (c), the one-time extension of the 120-day filing deadline must be a 30-day extension. The statute does not give trial courts discretion as to how long the extension will be. Either the claimant gets "one 30-day extension" of the deadline or no extension at all. *Id.* § 74.351(c). The district court's application of

18

section 74.351(c) in this case resulted in only a 7-day extension of the 120-day filing deadline. Such a result is not permitted by the statute. Therefore, we conclude that the district court abused its discretion by applying section 74.351(c) in this manner.

*Conclusion*

We agree with the district court that Constancio's first amended expert report was deficient with respect to causation, and we affirm the district court's finding in that regard. However, we are of the view that the district court's application of the extension provisions of section 74.351(c) was erroneous and failed to afford Constancio the extension, when granted, that the statute required. It is not clear to us on this record whether the district court would have granted additional time to the plaintiff if the court understood it was authorized to do so or whether the court was of the view that it had fully exercised all of its discretion allowed by the statute because it had granted an extension on May 10, 2006. The error in failing to properly extend the 120-day period also affected other aspects of the procedure in this case such as the filing and hearing of the defendant's motion to dismiss within what should have been the extended period for serving expert reports.

Constancio argues that, because of the district court's erroneous calculation of the extension period to cure, she should be granted a 30-day extension from the date that she received notice of the district court's ruling granting the defendant's motion to dismiss. That would have the effect of making her second amended report served on August 17, 2006, timely. However, the statute does not allow for this result. Section 74.351(c) provides that when a plaintiff receives notice of the grant of an extension outside of the original 120-day period for serving reports, the 30-day

19

extension period will run from the date that the plaintiff receives notice of the court's order *granting the extension. Id.* The statute does not allow for the extension period to run from the date the plaintiff receives notice of the court's ruling on a motion to dismiss. Nor is the appropriate remedy to simply declare that when the district court granted an extension on May 10, 2006, it had the effect—despite the court's stated June 10 deadline—of extending the period for serving reports to the 150th day or July 3. The parties took action in reliance on the erroneous June 10 deadline, such as filing and responding to a motion to dismiss in what should have been the extended period for serving reports. Neither can we order the district court to grant a new 30-day extension. The grant of an extension under section 74.351(c) is a decision within the district court's discretion, not this Court's. *Id*. The statute does not allow an appellate court to decide the question of whether an extension should be granted beyond the review of such a decision on an abuse of discretion standard.

Although the district court granted an extension here, the error in how the extension was granted affected the process and prejudiced the plaintiff. Under these circumstances, we remand to the district court for the court to consider whether to exercise its discretion to grant the type of extension allowed, and of a duration required, by section 74.351(c). We express no opinion as to whether such an extension is appropriate at this point, as that is a matter within the discretion of the district court. Should the district court continue in its view that an extension to cure under section 74.351(c) is warranted, such an extension at this point must be for 30 days and must run from the date the plaintiff receives notice of the court's order granting the extension.

Consequently, we reverse the district court's order dismissing Constancio's claims and remand this cause to the district court for further proceedings consistent with this opinion.

_____

G. Alan Waldrop, Justice

Before Justices Patterson, Pemberton and Waldrop;
    Dissenting Opinion by Justice Patterson

Affirmed in part; Reversed and Remanded in part

Filed:   September 5, 2008