

NUMBER 13-08-00418-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

PEARL CARRILLO, D.O.,                                              Appellant,

v.

JAY PALACIOS AND SOPHIA PALACIOS,
INDIVIDUALLY AND AS REPRESENTATIVES
OF THE ESTATE OF SANDRA PALACIOS, DECEASED,          Appellees.

On appeal from the 267th District Court of Victoria County, Texas.

# MEMORANDUM OPINION

**Before Justices Yañez, Garza, and Vela**
**Memorandum Opinion by Justice Garza**

The issues in this case involve expert reports filed in support of claims for medical malpractice and wrongful death against appellant, Pearl Carrillo, D.O. Carrillo challenges the trial court's: (1) overruling of her objections to expert reports filed by appellees, Jay Palacios and Sophia Palacios, individually and as representatives of the estate of Sandra

Palacios; and (2) denial of her motion to dismiss. By two issues, Carrillo contends that: (1) the trial court abused its discretion in overruling her objections and denying her motion to dismiss the Palacioses' claims for failure to comply with the expert report requirements contained in section 74.351 of the civil practice and remedies code, *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (Vernon Supp. 2008); and (2) the trial court erred in granting the Palacioses a thirty-day extension of time after determining that the initial expert report was sufficient. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The underlying claims in this lawsuit pertain to the treatment and care of Sandra Palacios by Carrillo while Sandra resided at the Retama Manor Nursing Center/Victoria South, L.L.C. d/b/a Retama Manor Nursing Center, Victoria South ("Retama"). Sandra first became a resident at Retama on June 16, 1999, and Carrillo began treating Sandra shortly thereafter.[1] During her residency at Retama, Sandra's health rapidly deteriorated. By 2004, Sandra began experiencing progressive weight loss,[2] and she developed multiple decubitus ulcers (bedsores). Later, Sandra began to refuse to eat or take her medications. On March 28, 2005, Carrillo ordered that Sandra be fed by a surgically implanted feeding tube and nutritional supplementation.

In spite of the feeding tube and nutritional supplementation, Sandra continued to lose weight and developed additional bedsores. In August 2005, Sandra was admitted to

---

[1] In their original petition, the Palacioses contend that Carrillo first began treating Sandra on June 16, 1999, when Sandra first became a resident at Retama; however, on appeal, Carrillo asserts that she treated Sandra from 2002 until approximately August 2005.

[2] According to an expert report produced by Steven Dobberfuhl, M.D., Sandra lost 34.4 pounds between October 2004 and March 2005 while at Retama and under the care of Carrillo.

a local hospital for surgical debridement of her bedsores. While at the hospital, Sandra gained some weight and some of her bedsores healed. However, Sandra was later re-hospitalized with septic hip prosthesis.[3] At this time, Sandra suffered cardio-pulmonary arrest and died. According to her death certificate, the date of Sandra's death was July 19, 2006, and the cause of death was a myocardial infarction.

On April 24, 2007, the Palacioses filed an original petition against Retama, alleging medical malpractice and wrongful death and survival claims pertaining to the treatment of Sandra.[4] Carrillo was joined in the lawsuit when the Palacioses filed their third amended petition on June 27, 2007. Specifically, in their third amended petition, the Palacioses asserted that Carrillo was negligent:

a.  In failing to properly monitor Mrs[.] Palacios['] fluids intake;

b.  In failing to properly monitor Mrs[.] Palacios['] calorie and/or food intake;

c.  In failing to properly diagnose Mrs[.] Palacios' condition;

d.  In failing to properly treat Mrs[.] Palacios' condition;

e.  In failing to properly document Mrs[.] Palacios' condition and progress;

f.  In failing to properly consult and follow-up with other medical specialists in a timely manner; and

g.  In failing to properly respond to calls from co-defendant [Retama].

The Palacioses contended that as a result of her alleged negligence in treating and

---

[3] A bacterial infection of the hip is known as a septic hip. *See* MedicineNet.com, *Definition of Septic*, *available at* http://www.medterms.com/script/main/art.asp?articlekey=11220 (last visited Oct. 3, 2008); *see also* Jonathan Cluett, *Septic Hip: Infection of the Hip Joint in Children*, *available at* http://orthopedics.about.com/od/pediatrichipinjuries/a/infection.htm (last visited Oct. 3, 2008).

[4] Retama is not a party to this appeal.

3

monitoring Sandra's health, Carrillo proximately caused Sandra's death.

Within 120 days of filing suit against Carrillo, the Palacioses produced expert reports of Steven Dobberfuhl, M.D., and Ginger Varca, R.N. *See id.* On August 13, 2007, Carrillo filed objections to Dobberfuhl's and Varca's expert reports and a motion to dismiss pursuant to section 74.351 of the civil practice and remedies code, contending that: (1) Dobberfuhl's expert report was conclusory and lacked the specificity required by section 74.351; and (2) Varca was not qualified to render an opinion regarding Carrillo's treatment of Sandra. *See id.* On January 15, 2008, the trial court conducted a hearing on Carrillo's objections and motion to dismiss. At the hearing, the following exchange occurred between the trial court and Carrillo's trial counsel:

| THE COURT: | Okay. Then I'm allowed to give them one 30-day extension— |
| [Carrillo's counsel]: | Yes, Your Honor. |
| THE COURT: | —after the 120 days? I believe that probably this report is sufficient, but if you want to visit with Mr. Easley[5] and tell him some specifics you'd like to have in addition to this information, I'll give them 30 days to write a supplemental letter. And I don't think that you're allowed to take his deposition on written questions and then take a live deposition. So if you give him too many requests, then probably we'll be back here with him fussing about those two things, too. But I think within reason if you want some—a few specific clarifications. What I'm going to tell you is I'm going to find that the report is sufficient. |
| . . . . | |
| THE COURT: | I'm going to overrule your motion, deny your motion, but I will allow you to have—to write a |

---

[5] Rex Easley Jr. represented the Palacioses at trial.

letter or to visit with Mr. Easley about what you think needs to be done and then Mr. Easley will have a chance to have his doctor, after he receives information from you, 30 days from the date of that letter to him, to file a supplemental letter. He doesn't have to write a whole nother [sic] report, but just supplement the very specific questions that you have.

The Palacioses did not serve any amended or supplemental expert reports within the thirty days allotted by the trial court for supplementation of Dobberfuhl's and Varca's original expert reports. On June 6, 2008, Carrillo filed a second motion to dismiss under section 74.351, renewing her previous challenges to Dobberfuhl's and Varca's expert reports. *See id.*

On June 13, 2008, the trial court denied Carrillo's second motion to dismiss. On July 1, 2008, Carrillo filed notice of her accelerated interlocutory appeal. *See* TEX. R. APP. P. 26.1(b), 28.1; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(9) (Vernon 2008) (providing that a person may appeal from an interlocutory order of a district court, county court at law, or county court that denies all or part of the relief sought by a motion under section 74.351(b)).

## II. STANDARD OF REVIEW

We review a trial court's decision on a section 74.351 motion to dismiss for an abuse of discretion. *See Jernigan v. Langley*, 195 S.W.3d 91, 93 (Tex. 2006); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001). The trial court abused its discretion if it acted arbitrarily or unreasonably without reference to any guiding rules or principles when it denied Carrillo's motion for dismissal. *See Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003); *Strom v. Mem'l Hermann Hosp. Sys.*, 110

S.W.3d 216, 220 (Tex. App.–Houston [1st Dist.] 2003, pet. denied). "The mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred." *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985). However, "a trial court has no discretion in determining what the law is or applying the law to the facts." *In re Kuntz*, 124 S.W.3d 179, 181 (Tex. 2003) (orig. proceeding); *see F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 694 (Tex. 2007) ("[F]ailing to correctly apply the law is an abuse of discretion.").

### III. ANALYSIS

### 1. Carrillo's Objections and Motion to Dismiss

In her first issue, Carrillo contends that the trial court abused its discretion in overruling her objections and denying her motion to dismiss for failure to comply with the expert report requirements contained in section 74.351. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351. Specifically, Carrillo argues that Dobberfuhl, in his expert report, failed to: (1) set out the specific standard of care that was applicable in the underlying action; (2) provide a factual basis for his conclusion that Carrillo breached the applicable standard of care; and (3) provide non-conclusory statements in establishing causation.[6] Furthermore, Carrillo asserts that the trial court abused its discretion in overruling her objections to the qualifications of Varca. Conversely, the Palacioses argue that the trial court did not abuse its discretion in denying Carrillo's objections and motion to dismiss because Dobberfuhl's expert report informed Carrillo of the specific conduct called into question and provided a

---

[6] On appeal, Carrillo does not challenge Dobberfuhl's qualifications to render an expert opinion in this matter.

6

basis for the trial court to conclude whether their claims had merit. *See Palacios*, 46 S.W.3d at 879.

## A. Applicable Law

Section 74.351 of the civil practice and remedies code provides, in relevant part, that:

> (a) In a health care liability claim, a claimant shall, not later than the 120th day after the date the original petition was filed, serve on each party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted. . . .
>
> (b) If, as to a defendant physician or health care provider, an expert report has not been served within the period specified by Subsection (a), the court, on the motion of the affected physician or health care provider, shall, subject to Subsection (c), enter an order that:
>
>> (1) awards to the affected physician or health care provider reasonable attorney's fees and costs of court incurred by the physician or health care provider; and
>>
>> (2) dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim.
>
> . . . .
>
> (*l*) A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6).
>
> . . . .
>
> (r)(6) "Expert report" means a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between the failure and the injury, harm, or damages claimed.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a)-(b), (*l*), (r)(6).

Generally, an expert report's adequacy does not depend on whether the expert uses any particular "magical words." *Windsor v. Maxwell*, 121 S.W.3d 42, 48 (Tex. App.–Fort Worth 2003, pet. denied) (citing *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 53 (Tex. 2002)). A report is sufficient if it "contains information summarizing and explaining the causal relationship between the doctor's failure to meet the applicable standards of care and the plaintiff's injury." *Id.* (citing *Bowie Mem'l Hosp.*, 79 S.W.3d at 53). The expert must explain the basis of "his statements" linking "his conclusions" to the facts. *See Earle v. Ratliff*, 998 S.W.3d 882, 890 (Tex. 1999). Moreover, a "fair summary" is "something less than a full statement" of the applicable standard of care, how it was breached, and how that breach caused the injury. *Spitzer v. Berry*, 247 S.W.3d 747, 750 (Tex. App.–Tyler 2008, pet. denied) (quoting *Palacios*, 46 S.W.3d at 880). "Nonetheless, 'a fair summary must set out what care was expected, but not given' and how that caused the injury." *Id.* (quoting *Palacios*, 46 S.W.3d at 880).

In *Palacios*, the Texas Supreme Court stated that:

> [t]he issue for the trial court is whether 'the report' represents a good-faith effort to comply with the statutory definition of an expert report. . . . That definition requires, as to each defendant, a fair summary of the expert's opinions about the applicable standard of care, the manner in which the care failed to meet that standard, and the causal relationship between that failure and the claimed injury. Because the statute focuses on what the report discusses, the only information relevant to the inquiry is within the four corners of the document.

46 S.W.3d at 878 (internal citations omitted). An expert report need not marshal all the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute in order to represent a good-faith effort. *Id.*; *see Spitzer*, 247 S.W.3d at 751. Additionally, the supreme court fashioned a two-part inquiry for reviewing expert reports.

8

*Palacios*, 46 S.W.3d at 879. "First, the report must inform the defendant of the specific conduct the plaintiff has called into question. Second, and equally important, the report must provide a basis for the trial court to conclude that the claims have merit." *Id.*

**B.      Discussion**

In his expert report, Dobberfuhl noted the following:

> Retama Manor South Nursing Home and Dr. Carrillo were obligated to work together in the health and care of each patient. The patient is dependent upon the physician to provide adequate orders to the nursing home staff to maintain the health and well being of the patient. The nursing home is obligated to fulfill the orders. Nursing home residents are in a particularly vulnerable state, as they have relinquished control of vital aspects of their lives. It is important that physicians meet the standard of care. *I am familiar with the standard of care in a nursing home patient. Among the numerous duties, physicians must monitor and manage adequate hydration and fluid supplementation to prevent multiple complications from dehydration. Physicians must provide orders for adequate caloric intake to prevent malnutrition and weight loss. Physicians must expect and prevent decubitus ulcers. These ulcers must be treated to prevent infection, severe pain and death. Physicians must monitor for changes in medical condition. If there are changes in the medical condition, the physician is expected to prescribe new therapy and treatments. These decisions should also reflect the patients' desires and decisions.*

> . . . By March 2004, Sandra Palacios required assistance with basic independent activities of daily living. It is around this time the patient began her accelerated decline. The patient underwent a series of hospitalizations (three) in late 2004 with her declining condition. She continued to fail to thrive over the next year, lost 34.4 pounds between October 2004 and March 2005, and developed multiple decubitus ulcers. . . . She had severe protein energy malnutrition, total caloric malnutrition and dehydration. Malnutrition impairments include immunodeficiency, cardiovascular compromise, respiratory weakness, and delayed wound healing. Each of these occurred in this patient.

> Ultimately[,] on March 28, 2005[,] she required a surgically implanted feeding tube for hydration and nutrition. Tube feeds and hydration were started. *On April 4, 2005[,] Dr. Carrillo ordered: "If res(ident) consumes <25% of meals, one can of Ensure BID then flush with 30cc H2O." This order provided adequate nutrition in this already malnourished patient. It was relied on [sic] the nursing home staff to judge when the patient ate less*

9

*than 25% or less. If the patient ate just 26%, and up to 90%, of the 2000 kcal meal, then she would receive too few calories and protein. Over time[,] this would result in significant weight loss and muscle atrophy.* The feeding orders were carried out for months. Retama Manor South staff did not consistently monitor Ms. Palacios's consumption. She continued to have dehydration and malnutrition despite the physician's and nursing home staff's ability to control her complete enteral intake. She continued to lose weight and develop more pressure ulcers. *Protein supplementation was not provided to meet this patient's nutritional needs. Total caloric supplementation was inadequate.*

As medical power of attorney [MPOA], it was the family's decision [that] Ms. Palacios should be treated with aggressive medical measures. Since the patient's code status was to continue aggressive medical management, medical decisions and management should have reflected that desire. . . . *If the patient's and the MPOA's desires were to be followed, Ms. Palacios should have had a feeding tube placed earlier. The continued weight loss and decline in condition could have been able to be halted and even reversed.*

. . . .

It is my professional expert opinion [that] Dr. Carrillo and Retama Manor South Nursing Home often provided good medical care to Sandra Palacios, but in some critical areas[,] she breached the standard of medical care. These include:

1. Failure to recognize a significant change in the patient's condition in a timely manner, to diagnose malnutrition, and to treat the malnutrition to the standard of care. Ms. Palacios had signs and symptoms of malnutrition documented by nursing home staff. Numerous contacts were made about the declining weight. Ms. Palacios wanted aggressive measures performed, which would include the option of a feeding tube. She was not given a feeding tube earlier. This delay allowed her condition to worsen, making it more difficult to recover.

2. Failure to order adequate total caloric nutritional supplementation for a patient with ongoing acute and sub-acute medical problems. There are higher nutritional requirements for a patient with active medical problems. Once a feeding tube was inserted, the supplementation orders allowed for continued malnutrition to occur. The tube feeds should not have been ordered only if [the] patient eats 25% of her meals, because it allowed for continued malnutrition. It

10

also required the nursing home staff to monitor every meal consumed have [sic] to make a judgment call as to whether she had eaten enough or not. This contributed to the failure of the ulcers to heal, prolonged the patient[']s need for wound care, and increased her risk for infections.

3. Failure to order adequate protein supplementation for a patient with ongoing muscle atrophy and decubitus ulcers. The tube feeds did not provide enough additional protein for healing of the ulcers.

4. Failure to order adequate hydration for this patient, contributing to the patient's continued failure to thrive, decubitus ulcers, and death.

5. Failure to follow the progress of Ms. Palacios' declining condition more while she is in a nursing home, Dr. Carrillo should have evaluated the progress of this patient more frequently.

6. Failure to treat to the standard of care resulted in a prolonged period of increased immune deficiency, resulting in frequent hospitalizations.

7. The cumulative effect has resulted in delayed decubitus ulcer healing, the development of more ulcers, immune deficiency, and increased stress on the cardio-respiratory system. The patient did demonstrate an ability to reverse her downward course once she was under the care of another physician and facility. To recover from the severe malnourished state was too much for her systems. Although she was frail and fraught with chronic diseases, she would have lived longer had her body not had to contend with the additional stresses of the malnutrition, dehydration, immunodeficiency, and protein energy malnutrition. As a result, Ms. Palacios died.

It was Ms. Palacios and her MPOA's wishes to be provided with aggressive medical measures. Her wishes were not followed in a timely manner. *The prolonged period of dehydration, malnutrition, and immunodeficiency contributed and caused her failure to thrive and her death. No single event caused Sandra Palacios' death, but the accumulation of multiple failures did. Unfortunately, Dr. Carrillo failed to meet the standard of care in this patient's case. Her negligence and the negligence of the Nursing Home as described above, together formed the proximate cause of the patient's death.*

11

(Emphasis added.)

Carrillo's primary complaints are that Dobberfuhl's expert report fails to provide sufficient information so as to constitute notice of the required elements of an expert report, *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6), and that the report is conclusory with respect to the standard of care and the alleged breaches of the standard of care. We disagree.

It is clear from the Palacioses' pleadings that they took issue with Carrillo's failure to monitor Sandra closely to ensure that she was sufficiently hydrated, fed, and treated. They also complained that Carrillo's neglect for Sandra's condition led to the formation of decubitus ulcers, which exacerbated her condition. Dobberfuhl's expert report adequately sets forth the standard of care pertaining to Carrillo, how that standard was breached, and the results caused by the breach—malnutrition, decubitus ulcers, excessive weight loss, and, ultimately, Sandra's death.[7] We conclude that Dobberfuhl's expert report adequately

---

[7] The trial court stated the following with regard to Dobberfuhl's expert report:

THE COURT: When I read this report, it's my opinion that the doctor's opinion is that this lady died because Dr. Carrillo failed to monitor her closely enough, and in that monitoring, failed to see to it that she was sufficiently hydrated and fed to keep her body's general health at a level that she could handle all of the different things that were attacking her, which included decubitus ulcers, dehydration, infection from the decubitus ulcers, and then all of the other things that you mentioned to me at the beginning which were obvious to her medical condition. And it appears to me that it's his opinion and that he's going to testify that if the doctor had paid closer attention while she did what the bare bones minimum was, had she paid closer attention, that the lady's life would have been prolonged.

. . . .

THE COURT: And I think that that's what the statute says he has to do. He has to tell you what's he's complaining about. He's told you what he's complaining about. He has to tell you, you know, basically what he thinks the standard is for that. I think he's done that. . . .

12

informed Carrillo of the complained-of conduct and provided the trial court with a basis to determine whether the Palacioses' claims had merit; therefore, the report was adequate. *See Palacios*, 46 S.W.3d at 879.

Carrillo also takes issue with Varca's expert report. Specifically, Carrillo asserts that Varca was not qualified to offer an expert opinion on Carrillo's treatment of Sandra because Varca was a registered nurse and not a doctor at the time the events in question transpired. In reviewing Varca's expert report, we find that Varca's report addresses only the treatment provided by Retama, not Carrillo. In fact, Varca's expert report stated: "It is my professional expert nursing opinion that the *nursing staff at Retama Manor South failed to provide nursing care that met appropriate standards of care* for Sandra Palacios during her admission." (Emphasis added.) Varca only references Carrillo in the portion of her report where she recites pertinent facts in the treatment history of Sandra. At no time does Varca address: (1) the propriety of Carrillo's treatment of Sandra; or (2) the required elements for expert reports with respect to Carrillo. Therefore, we conclude that Carrillo's argument as to Varca's expert report is irrelevant. Based on the foregoing, we overrule Carrillo's first issue on appeal.

## 2. The Propriety of the Thirty-Day Extension

In her second issue, Carrillo, while conceding that this issue is not dispositive, asserts that the trial court misapplied the law when it granted the Palacioses a thirty-day extension to supplement Dobberfuhl's expert report after it had found the expert report to be sufficient. Carrillo argues that the trial court: (1) was only authorized to grant a thirty-day extension to cure deficiencies in the expert report; (2) lacked discretion to grant an extension since the report was deemed to be sufficient; and (3) "erroneously ordered an

13

incorrect start date for the 30-day extension to begin tolling." The Palacioses argue that Carrillo assigns error to a ruling that was never made because the record contains neither a written motion for a thirty-day extension nor a written order granting the extension.

## A. Applicable Law

Section 74.351(c) of the civil practice and remedies code provides the following with respect to the trial court's discretion to grant a thirty-day extension to file a sufficient expert report:

> If an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the court may grant one 30-day extension to the claimant in order to cure the deficiency. If the claimant does not receive notice of the court's ruling granting the extension until after the 120-day deadline has passed, then the 30-day extension shall run from the date the plaintiff first received notice.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c). Under the plain language of section 74.351(c), an extension of time to cure deficiencies of a report is only available when a report has been served within the 120-day deadline and the elements of the report have been found deficient by the trial court. *Id.*; *see Constancio v. Bray*, No. 03-06-00583-CV, 2008 Tex. App. LEXIS 6652, at *23 (Tex. App.–Austin Sept. 5, 2008, no pet. h.) (noting that "[t]he court's finding that the report is deficient, in the terminology of the statute, means that a complying or satisfactory expert report has not yet 'been served' within the 120-day deadline") (citing *Lewis v. Funderburk*, 253 S.W.3d 204, 207-08 (Tex. 2008)).

## B. Discussion

In the instant case, the trial court concluded that Dobberfuhl's report was sufficient and, therefore, denied Carrillo's motion to dismiss. At the hearing on Carrillo's objections and motion to dismiss, counsel for Carrillo argued that Dobberfuhl's report was not specific

enough to meet the *Palacios* standard and that the report required the trial court to make impermissible inferences. *See Palacios*, 46 S.W.3d at 879. Specifically, counsel for Carrillo noted the following:

[Carrillo's counsel]: I understand the Court's position, that the Court believes he's going to testify in a certain way. But therein lies the problem. The problem is that this report requires the Court to draw certain inferences, that you believe he's going to testify that the patient—that the patient should have been monitored more closely, it requires us to infer that, well, would it have been every week that the doctor saw the patient, would that have been frequently enough.

THE COURT: I think what he said, [Carrillo's counsel], is that once every 60 days was not enough.

[Carrillo's counsel]: Well, once every 60 days is what is required by the regulations, Your Honor.

THE COURT: I understand. I understand that. But what he's saying to you is in his opinion once every 60 days was negligent in this fact scenario.

[Carrillo's counsel]: I understand.

THE COURT: I don't know. You have to ask him that question in that deposition, what's correct.

[Carrillo's counsel]: But what he doesn't state, Your Honor, is what would have been sufficient and that's what's required by statute.

THE COURT: He says more.

[Carrillo's counsel]: More frequently doesn't really say a whole lot, Your Honor.

In response to this exchange, the trial court stated that the Palacioses had an additional thirty days from the date of the hearing to file a supplemental expert report to

Dobberfuhl's report to address the specific questions raised by Carrillo's counsel.[8] The record does not reflect that the Palacioses filed a motion for an extension; instead, the trial court granted the thirty-day extension sua sponte. However, because the trial court concluded that the expert reports were sufficient and because no expert reports were produced subsequent to the trial court's granting of the additional thirty days to file a supplemental expert report, this issue is not dispositive. We therefore decline to make a finding that the trial court erred in granting a thirty-day extension sua sponte. Accordingly, we overrule Carrillo's second issue on appeal.[9]

## IV. CONCLUSION

Based on the foregoing, we affirm the judgment of the trial court denying Carrillo's objections and motion to dismiss.

DORI CONTRERAS GARZA,
Justice

Memorandum Opinion delivered and
filed this the 25th day of November, 2008.

---

[8] On appeal, Carrillo posits a litany of additional questions pertaining to Dobberfuhl's report and argues that more specificity was required of Dobberfuhl in producing his report. However, we again note that an expert report need only provide a fair summary of the required elements and that the precise specificity desired by Carrillo is not required. See TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) (Vernon Supp. 2008); *Spitzer v. Berry*, 247 S.W.3d 747, 750 (Tex. App.–Tyler 2008, pet. denied) (quoting *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 880 (Tex. 2001)).

[9] We need not address Carrillo's argument that the trial court "erroneously ordered an incorrect start date for the 30-day extension to being tolling" because it is not dispositive. See TEX. R. APP. P. 47.1.

16